**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| PAMELA J. PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | 8:10CV148 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Pamela J. Patterson (Patterson) filed an application for supplemental security income (SSI) under Title XVI of the Social Security Act (Act), 42 U.S.C. §§ 1381, *et seq.*, on October 20, 2006, alleging disability beginning July 1, 2009.  The Social Security Administration (SSA) denied benefits initially and on reconsideration.  An administrative law judge (ALJ) held a hearing on July 29, 2009.  On September 22, 2009, the ALJ determined Patterson was not disabled within the meaning of the Act.  The Appeals Council denied Patterson's request for review on March 10, 2010.  Patterson now seeks judicial review of the ALJ's determination as it represents the final decision of the SSA Commissioner.[1]

Patterson filed a brief (Filing No. 21) and an index of evidence (Filing No. 22), which contains the Global Assessment of Functioning (GAF) Scale and several Social Security Rulings (SSRs), in support of this administrative appeal.  The Commissioner filed the administrative record (AR.) (Filing No. 14) and a brief (Filing No. 27) in opposition  to Patterson's appeal for benefits.  Patterson did not file a reply.  Patterson appeals the Commissioner's decision, asking that the decision be reversed and benefits awarded because:  (1) the Appeals Council and the ALJ mishandled the evaluation of Patterson's mental impairment, including a failure to develop the record and consider new material evidence; (2) the record lacks substantial evidence to support the ALJ's residual functional capacity (RFC) assessment; (3) the ALJ failed to properly consider the combined effect of Patterson's joint disease and obesity; and (4) the ALJ posed an inaccurate hypothetical

---

[1] The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  **See** Filing No. 18.

question to the vocational expert whose responses do not constitute substantial evidence. See Filing No. 21 - Brief p. 1.  After reviewing the record, the ALJ's decision, the parties' briefs, the transcript, and applicable law, the court finds the ALJ's ruling, that Patterson is not disabled, should be affirmed because it is supported by substantial evidence in the record.

## PROCEDURAL BACKGROUND

Patterson applied for SSI benefits on October 20, 2006, pursuant to the Act (AR. 105).  Patterson previously applied for benefits in 1998, 2001, and March 2005 (AR. 25). Patterson's March 2005 application was denied, without an appeal, and she does not seek to re-open any denied applications (AR. 25, 152).  In the October 20, 2006, application, Patterson alleged an inability to engage in any substantial and gainful work activity as of September 1, 2005, due to back pain and chronic leg and knee pain (AR. 53, 105).  The SSA denied benefits initially (AR. 53) and on reconsideration (AR. 54).  In responses to interrogatories on June 1, 2009, Patterson wrote that she was first unable to work on January 25, 2007 (AR. 200, 208).  Upon Patterson's request, on July 29, 2009, ALJ Jan E. Dutton held a hearing (AR. 23-50).  During the hearing, Patterson amended the alleged onset date of her disability to July 1, 2009 (AR. 26).  The ALJ issued a decision on September 22, 2009, determining Peterson did not have a severe mental impairment and was not otherwise disabled or eligible for SSI benefits under the Act (AR. 13-22).  The Appeals Council denied Patterson's request for review on March 10, 2010 (AR. 1-5).

## FACTUAL BACKGROUND

### A.    Medical Records

Relevant to Patterson's appeal, the AR contains evidence from Patterson's 2005 application for benefits along with evidence associated more directly with her 2006 application.  Such evidence is summarized below.  Patterson was born on August 1, 1959 (AR. 100).   The medical records reflect Patterson suffered from depression and hallucinations in her teens (AR. 293).  Patterson reported she had been hospitalized twice in 1990, when she became disoriented and had a nervous breakdown (AR. 293).

2

Patterson denies hearing voices since that time (AR. 293).  Patterson presented to the Douglas County Health Center for psychiatric treatment for schizophrenia periodically between 2001 and July 6, 2004 (AR. 305-316).  Treatment was terminated due to Patterson's non-compliance with medication management appointments (AR. 305).

On May 18, 2005, Jeffrey E. Jarrett, M.D. (Dr. Jarrett), conducted a physical examination of Patterson associated with complaints of knee pain (AR. 296-303).  During the examination, Patterson reported she had been in a good state of health without limitation in about 2000 and 2001, but had increasing knee pain since then (AR. 296).  Dr. Jarrett noted Patterson had an antalgic gait as she favored her left knee and hip (AR. 300).  Dr. Jarrett observed crepitus in both knees and tenderness in the left knee (AR. 300).  There was no clubbing, cyanosis, edema, or joint effusion and straight leg raising was negative (AR. 300).  Patterson had normal motor function, coordination, reflexes, muscle mass, muscle tone, and muscle strength (AR. 300).  In x-rays, Patterson's left knee showed moderate degenerative joint disease with narrowing of the medial and lateral compartments (AR. 300).  At the time of the examination, Patterson was 64 inches tall and weighed 215 pounds (AR. 299).  Dr. Jarrett wrote, "it is conceivable that she would have difficulty keeping up with the task of any normal daily activity that would be required in a position of gainful employment" (AR. 301).  Dr. Jarrett opined there could be some restrictions on Patterson's ability to sit, stand and walk for "prolonged periods" based on the degenerative joint disease, but did not indicate specific limits (AR. 301).

On May 20, 2005, Patterson underwent a psychological evaluation (AR. 292-295).  Amy T. Corey, Ph.D. (Dr. Corey), noted Patterson's typical day included rising early to care for her children, attending appointments, cooking, cleaning, shopping, and working through a temporary agency when work was available (AR. 294).  Patterson reported to be 5'6" tall and to weigh 220 pounds (AR. 292).  Patterson also reported she had earned a degree in childcare from a community college (AR. 292).  Patterson walked with a limp into the examination and explained she had a hard time walking due to arthritis in her left knee (AR. 292-293).  Patterson also reported she had back problems and muscle spasms in her lower extremities since 1994, when she slipped on ice and fell down some stairs (AR. 293).

3

Dr. Corey concluded Patterson did not appear restricted in her daily activities or social functioning although she complained of a depressed mood, without other symptoms of depression (AR. 294). Dr. Corey wrote Patterson had a good prognosis, particularly in compliance with treatment even though, despite noncompliance with medication, Patterson denied symptoms such as hallucinations and suicidal ideation, but did report feelings of confusion and lack of focus (AR. 294). Dr. Corey estimated Patterson to be of below average intelligence, with fair insight and judgment, and assigned Patterson a GAF of 61[2] (AR. 294). Dr. Corey gave her opinion that Patterson could sustain her concentration and attention for task completion; understand, remember, and carry out short and simple instructions under ordinary supervision; relate appropriately to co-workers and supervisors; and adapt to changes in her environment (AR. 294).

On June 15, 2005, A.R. Hohensee, M.D. (Dr. Hohensee), performed a residual functional capacity assessment for Patterson (AR. 336-344). Dr. Hohensee provided the opinion that Patterson's allegations of pain and limitations appear partially credible (AR. 344). Dr. Hohensee notes that based on documented degenerative arthritis in the left knee and obesity, Patterson "would appear to be limited to sedentary work" (AR. 344). Specifically, he opined Patterson should avoid repetitive knee bending, but she could sit about 6 hours in an 8-hour workday and stand and/or walk at least 2 hours in an 8-hour workday (AR. 337).

On January 4, 2007, Patricia Otis, M.D. (Dr. Otis), performed a consultative examination of Patterson (AR. 358-364). Patterson measured 63.5 inches tall and weighed 216 pounds (AR. 360). During the examination, Patterson reported that her legs hurt due to "arthritis," but denied any past trauma or current joint swelling, redness, numbness, tingling, muscle weakness, or difficulty with ambulation (AR. 358). However, Patterson stated she sometimes cannot walk due to the pain in her legs (AR. 358).

---

[2] The Global Assessment of Functioning (GAF) is a clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 30-32 (4th ed. text rev. 2000) (DSM-IV-TR). A GAF of 61–70 indicates some "mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . ., but generally functioning pretty well, has some meaningful interpersonal relationships." **See** DSM-IV-TR at 34.

Patterson rated her pain as an 8 on a 10-point pain scale, but upon physical examination was in no acute distress (AR. 360). Patterson's physical examination was normal; she had normal pulses, gait, station, sensation, and nerve function (AR. 360-361). She had minimal crepitus in her knees, but no tenderness with palpation and she retained a full range of motion (AR. 361). Patterson reported taking Tylenol, as needed, and having prescriptions for haloperidol and benztropine (AR. 359). Dr. Otis noted no objective findings that would restrict Patterson "from any particular form of employment" and no evidence of any neurological involvement with her pain (AR. 361-362).

Three weeks later, on January 25, 2007, Patterson was stuck by a car when she was standing on a curb (AR. 172-173, 381). Patterson went to the emergency room, where x-rays of her right leg were taken (AR. 381). Patterson was treated and released with a prescription for Naprosyn (AR. 381). When she returned for follow-up on January 30, 2007, at the Clarkson Family Medicine Clinic (Clarkson Clinic), Patterson reported pain on the right side of her neck and in both legs, although the pain gradually decreased with the use of Naprosyn (AR. 381). She reported she continued working and that her day was not otherwise disrupted (AR. 381). At that time, Patterson described her medical history to include "depression in the past which has not been treated for a few years" (AR. 381). Physical examination revealed abrasions on her right leg (AR. 382). Michelle Choutka, M.D. (Dr. Choutka), observed crepitus in both of Patterson's knees, but her joints were stable and range of motion only somewhat limited (AR. 382). Patterson weighed 223 pounds during the examination (AR. 381). Dr. Choutka noted cervical strain, but full range of motion and no neurologic symptoms (AR. 382). Dr. Choutka continued Naprosyn, which seemed to help with residual pain from the accident and osteoarthritis (AR. 382).

On March 23, 2007, Patterson returned to the Clarkson Clinic to follow-up with Dr. Choutka about leg pain (AR. 379). Upon physical examination, Dr. Choutka observed Patterson's right leg abrasion was resolving, as was the swelling in her ankles, and Patterson had full range of motion in her knee and ankle joints (AR. 379). Patterson weighed 218 pounds during the examination (AR. 379). Patterson reported medication (Naprosyn), physical therapy, and massage were helping with her pain and hematomas (AR. 379). Dr. Choutka advised Patterson to continue using Naprosyn and physical

5

therapy (AR. 379).  After one evaluation and five visits, Patterson was discharged from physical therapy because she had met her goals including climbing the three flights of stairs to her apartment without requiring a rest break, normalizing her gait pattern, and tolerating thirty minutes of continuous light exercise (AR. 383).  The physical therapist recommended Patterson continue independently with her exercise program and walk outdoors to increase activity (AR. 383).  Patterson received chiropractic treatment in May and July of 2007 (AR. 402-405, 407-409).

On August 21, 2007, Glen Knosp, M.D. (Dr. Knosp), provided a consultative evaluation of Patterson (AR. 389-396).  Dr. Knosp evaluated Patterson taking into consideration the decision on her 2005 application for benefits that her disability was not severe, but noted her subsequent car accident resulting in deep bruising and other injuries amenable to physical therapy (AR. 396).  At the time of the evaluation, Dr. Knosp noted "[w]hile [Patterson] may not be able to engage in work activities at the present time, her period of disability is not expected to last for a continuous period of twelve months" (AR. 396).  Dr. Knosp opined Patterson would be able to "engage in at least medium work activities" by January 25, 2008 (AR. 396).  Moreover, Dr. Knosp indicated Patterson would be able to sit, stand and/or walk about 6 hours in an 8-hour workday (AR. 390).

On January 11, 2008, Patterson presented to the Clarkson Clinic with sores on her arms (AR. 427).  Patterson explained that "as a cleaner" she regularly used soaps and detergents and had developed raised itchy bumps that did not improve with regular use of lotion (AR. 427).  At that time, Patterson also complained of "significant leg pain that occurs when she is walking or sitting" and causes her to limp (AR. 427).  Patterson wanted to have the leg pain evaluated since she had not seen a doctor about it since May 2007, when she was advised to take Tylenol and Aleve for pain (AR. 427).  Patterson reported she had no significant worsening distress in her legs (AR. 427).  Patterson weighed 222 pounds during the examination (AR. 427).  Patterson began medication for her arms and agreed to continue taking Tylenol and Aleve, as well as exercising, for her leg pain (AR. 427).

On March 31, 2009, Patterson sought care at the Clarkson Clinic for bilateral knee pain (AR. 424).  Michelle Sell, M.D. (Dr. Sell), observed a decreased range of motion and crepitus over the knees (AR. 424).  Patterson reported pain with walking and greater knee

6

and joint pain on the right side (AR. 424). Patterson requested a prescription for a cane (AR. 424). Patterson weighed 218 pounds on that date (AR. 424). Dr. Sell suspected arthritis (AR. 424). Dr. Sell ordered x-rays and recommended Patterson increase her use of ibuprofen to 600 mg three times a day (AR. 424). X-rays of Patterson's knees indicated moderate degenerative joint disease (AR. 426).

On April 22, 2009, Patterson reported for a follow-up examination with A.J. Nixon, M.D. (Dr. Nixon), who provided Patterson with prescriptions for a cane and Celebrex (AR. 423). Physical examination of her knees revealed mild joint effusion and some crepitus with weight bearing (AR. 423). Dr. Nixon discussed future options with Patterson such as steroid injections and knee replacement surgery (AR. 423). Patterson indicated she wanted to wait as long as possible before having surgery (AR. 423).

On July 8, 2009, Patterson went to the Clarkson Clinic asking for a physician to sign a form for her to receive financial assistance for air conditioning during the summer months (AR. 422). Patterson reported she gets very hot and cannot afford to pay for air conditioning (AR. 422). During this visit, Patterson weighed 227 pounds (AR. 422). The doctor denied the request, telling Patterson she would not be eligible for such assistance because she did not have the required medical history, for example, diabetes or coronary artery disease (AR. 422).

On September 28, 2009, Patterson went to the Clarkson Clinic for knee pain (AR. 438).[3] Patterson reported she took ibuprofen for pain (AR. 438). Patterson rated the pain as a 10 out of 10 that day, but stated it was "no worse than normal" (AR. 438). Patterson explained ibuprofen was not effective to relieve her pain, which worsened with long periods of standing or walking and had been worse since the car accident in January 2007 (AR. 438). Patterson weighed 238 pounds during the examination (AR. 438). Upon examination, Patterson's knees showed a full range of motion with pain throughout, but no crepitus in her right knee and mild crepitus in her left knee (AR. 438). Nathaniel Alvis, M.D. (Dr. Alvis), administered a steroid injection in Patterson's left knee and she experienced immediate relief (AR. 439). Dr. Alvis recommended Patterson return in one week for

---

[3] This and the subsequent medical records are dated after the ALJ's decision, but were submitted to, and considered by, the Appeals Council (AR. 1-2, 5).

another injection (AR. 439).  Dr. Alvis asked Patterson about her depression, but Patterson reported she was not on depression medications, was feeling well, and was not suicidal (AR. 439).

A week later, on October 5, 2009, Patterson told Dr. Alvis that she had been doing well and her left knee pain was almost completely gone since the steroid injection (AR. 436).  Dr. Alvis administered a steroid injection in Patterson's right knee (AR. 437).  Dr. Alvis recommended Patterson follow-up with her knee pain as needed, but she could not have another injection for four months (AR. 437).  Dr. Alvis also recommended Patterson follow-up with Douglas County Health Center for her depression and schizophrenia (AR. 437).  However, Patterson reported she was not taking medication, hearing voices, or feeling depressed or suicidal (AR. 437).

On October 29, 2009, Beverly A. Doyle, Ph.D. (Dr. Doyle), performed a psycho-educational evaluation of Patterson (AR. 429-435).  Patterson reported she had worked until the past year doing cleaning, but she was no longer able to work because of her physical problems (AR. 430).  Patterson reported having problems with other kinds of work because of her mental health (AR. 430).  Specifically, Patterson described crying spells, confusion, and an inability to get out of bed due to depression (AR. 430).  Dr. Doyle wrote that concurrent testing indicated Patterson had delays in all academic areas, except word reading (AR. 430).  Dr. Doyle opined Patterson would have difficulty performing jobs requiring academic skills (AR. 430).  Dr. Doyle assessed Patterson with a GAF of 50[4] and indicated Patterson had mood disturbances including decreased energy and thoughts of suicide (AR. 430-431).  Dr. Doyle opined Patterson had extreme limitations in performing activity within a schedule and maintaining regular attendance (AR. 433).  Dr. Doyle wrote that Patterson's physical problems caused this limitation and exacerbated Patterson's mental health issues (AR. 433).  Dr. Doyle opined Patterson had marked difficulties in maintaining concentration, persistence, or pace, resulting in a failure to complete tasks in a timely manner and would likely have uncontrolled crying spells when performing unskilled

---

[4] A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  **See** DSM-IV-TR at 34.

work during a normal workday (AR. 434). Dr. Doyle noted moderate, mild, or no limitations in other areas, such as an ability to get along with co-workers, ability to accept criticism from supervisors, and ability to deal with work stress (AR. 434).

**B.     Administrative Hearing**

At the administrative hearing on July 29, 2009, Patterson testified on her own behalf. Patterson was 49 years old on the date of the hearing, and her highest level of education completed was the eleventh grade, but she had earned a GED (AR. 29). She testified she has average intelligence and had no trouble passing the GED test (AR. 30). Patterson was 5' 5" tall and weighed 227 pounds at the time of the hearing (AR. 43). Patterson has never been married (AR. 30). She has four children who were ages 17 through 29, at the time of the hearing (AR. 30). The three youngest children are living with her (AR. 30). The children are working and/or in school and help Patterson financially (AR. 31). Patterson receives food stamps and housing assistance (AR. 31). Patterson testified she no longer receives certain financial assistance as a sanction for her failure to attend a job-seeking class (AR. 31). Patterson explained she had taken the class previously and did not find it helpful (AR. 31).

 Patterson attempts to find employment by applying for jobs, such as housekeeping, over the computer (AR. 32). Patterson worked as a cashier in a casino restaurant for "maybe a month" and at Burger King for about 18 months (AR. 32-33). Three to four years prior to the hearing, Patterson completed the Employment First class at Goodwill Industries to assist her in finding employment (AR. 43-44). Patterson took a similar class through Project Resolve to prepare her for employment (AR. 44). Patterson was tested for Vocational Rehabilitation about ten or fifteen years ago (AR. 44). Patterson testified she has never been told she worked too slowly (AR. 44-45). Patterson testified she has only had short-term employment because she is fired a lot, but she does not know why (AR. 45).

Patterson did not work during the early 1990s because she was receiving assistance and staying home with her children (AR. 33). Patterson never earned more than about $1,000 in a year due to "having problems with being stable on a job, stability; and then,

taking care of children at the same time" (AR. 33-34). Patterson testified she was "in and out of the hospital for the psychiatric treatment" related to blackouts (AR. 34). Patterson did not know what her diagnosis had been, but testified she was on medication for depression (AR. 34). However, Patterson "weaned [herself] off of those medications" on her own and has not had treatment for "mental issues" in the last five or ten years (AR. 35). She felt the medications made her hallucinate (AR. 35). Patterson stated she felt somewhat improved mentally after she stopped taking the medication and she no longer needed treatment (AR. 35-36). Patterson stated she is not alleging any mental problems as part of her disability application (AR. 36).

Patterson indicated she is alleging a disability because of arthritis and testified:

> Mainly, it's my physical. I'm, I'm in that much. I can't hardly get out of the car when I'm in the car, and I can't hardly get out of the bed in the mornings. I have a problem. When I do get out, it's like I can't make it to the bathroom.

(AR. 36). Patterson told her doctor she did not want to have knee replacement surgery (AR. 37). Patterson saw another doctor to obtain documentation that heat is detrimental to her health, but the doctor refused to sign the document based on Patterson's lack of symptoms (AR. 38).

Patterson described how her ability to walk has decreased since she was struck by a car while standing at the curb during the winter of 2007 (AR. 38-39). After the accident, Patterson went to the hospital for x-rays, was treated and released (AR. 39-40). Patterson underwent physical therapy and chiropractic treatments for about one month (AR. 40-41). Based on recommendations, Patterson walked outdoors, which she continues to do (AR. 41). Patterson states she can walk about "a block and a half or so," then her legs start to hurt and she gets tired (AR. 41).

Patterson described her daily activities (AR. 42). Patterson wakes between 4:00 and 5:00 a.m. and showers before making sure her daughter is up for school (AR. 42). Patterson does most of the housework including cooking, cleaning, and laundry (AR. 42). Patterson does not drive a car because her license expired, but has no bar to reinstatement (AR. 42-43). Patterson's daughter drives her to the store and helps her get groceries (AR. 42). In the afternoon, Patterson takes a walk "just around the corner,

10

maybe," then she sits and rests her legs and reads the paper (AR. 43). There is nothing around the house that Patterson is prevented from doing due to her alleged disability (AR. 43). However, Patterson engages in household activities in spurts and testified she can only be on her feet for less than a half-hour to an hour at a time (AR. 43).

Gail Leonhardt, a vocational expert (VE), also testified at the hearing (AR. 46). The ALJ asked the VE about a 50-year old individual with limited education, through the 11th grade, who has tried a lot of jobs, but has no past work (AR. 46). First, the ALJ focused on light exertion, asking about an individual who "could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds; could stand, sit, or walk six hours in an eight-hour day; could occasionally do postural activities: climb, balance, stoop, kneel, crouch, crawl; should not work on ladders, ropes, scaffold; no with dangerous heights or equipment" (AR. 46-47). In addition, the ALJ noted the individual would be doing unskilled work which was routine and repetitive (AR. 47). The VE gave the opinion the individual would have no limitations for any unskilled work such as production assembler, hand packager (light exertion), unskilled cashier, and housekeeper cleaner, which jobs exist in significant numbers in the regional and national economy (AR. 47-48).

The ALJ asked the VE a second question to assume the individual had the symptoms described by Patterson during the hearing (AR. 48). The VE noted Patterson testified she could be on her feet for less than one hour and could only do activity in spurts (AR. 48). The VE gave the opinion the limitations would preclude the individual from the ability to do light work (AR. 48-49). However, if the individual were able to stand for an hour, then take a short break and return to work, such individual would be able to do light work (AR. 49).

## THE ALJ'S DECISION

The ALJ concluded Patterson was not disabled under the Act and was not entitled to any disability benefits (AR. 21). The ALJ framed the issue as whether Patterson was eligible for supplemental security income benefits as a disabled individual under the Act, § 1614(a)(3)(A), 42 U.S.C. § 1382c(a)(3)(A), and if so, when such disability commenced and its duration (AR. 13-14). As noted by the ALJ, the Act defines "disability" as an inability

to engage in any substantial gainful activity due to physical or mental impairments (AR. 13-14).  **See** 42 U.S.C. § 1382c(a)(3)(A).  These impairments must be expected to result in death or must last for a continuous period of at least twelve months.  **_Id._**

The ALJ must evaluate a disability claim according to the sequential five-step analysis prescribed by the Social Security regulations.  **See** 20 C.F.R. § 416.920(a); **_Hurd v. Astrue_, 621 F.3d 734, 738 (8th Cir. 2010)**.

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

**_Goff v. Barnhart_, 421 F.3d 785, 790 (8th Cir. 2005)** (citation omitted).  More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience.  **See** 20 C.F.R. § 404.1520(a).  If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience.  If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy.  A claimant's residual functional capacity is a medical question.

**_Singh v. Apfel_, 222 F.3d 448, 451 (8th Cir. 2000)** (internal citations omitted).  "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled."  **_Pelkey v. Barnhart_, 433 F.3d 575, 577 (8th Cir. 2006)** (citation omitted)).

In this case, the ALJ followed the appropriate sequential analysis.  At step one, the ALJ found Patterson had not engaged in any type of substantial gainful work activity since July 1, 2009 (AR. 15).  At step two, the ALJ found Patterson has "degenerative disease of

the knees complicated by obesity (227 pounds)" which has imposed more than slight limitations on her ability to function (AR. 15-16). However, the ALJ also determined Patterson "does not have a severe mental impairment" (AR. 15-16). At step three, the ALJ determined Patterson does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart 4, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526) (AR. 16).

Nevertheless, the ALJ found Patterson to have limitations on her ability to perform work-related functions, or an RFC, such that Patterson could only

> perform the exertional requirements of light labor, i.e., she can occasionally lift/carry items weighing 20 pounds, frequently lift/carry items weighing up to 10 pounds, sit for 6 hours during an 8-hour workday, and stand/walk for [6] hours during an 8-hour workday. She cannot climb ladders, scaffolds or ropes, but can occasionally perform other postural activities including climbing stairs, bending, squatting, couching [sic] and kneeling. She should avoid unprotected heights and moving machinery, and is limited to unskilled labor.

(AR. 16-17) (alteration from 8 to 6 based on later text of ALJ opinion). The ALJ did not find Patterson's testimony credible to the extent Patterson attempted to establish total disability (AR. 19). The ALJ noted that despite Patterson's alleged pain, she remains active raising four children (AR. 19). In addition, Patterson's work record is poor, she had to be pressured to take government sponsored job training classes, and did not appear motivated to seek or maintain employment (AR. 19). Moreover, Patterson attributed her knee pain to trauma sustained in 2007 even though medical records suggest knee complaints as early as May 2005 (AR. 19). Further, the 2007 accident, for which Patterson was treated and released, did not result in permanent limitations or a deterioration of Patterson's prior limitations (AR. 19-20). The ALJ relied on Patterson's denial of any mental conditions and noted Patterson's decision to wean herself from mental health medication (AR. 19). The ALJ found it "prudent" to limit Patterson to unskilled labor based on a combination of Patterson's testimony and early childhood intellectual functioning tests (AR. 17). The ALJ noted "there is every reason to believe that [Patterson's physical] discomfort would lessen if she were to lose weight," but the ALJ reduced Patterson's exertional level to light based on record evidence of moderately advanced degenerative

13

knee joint disease (AR. 17).  Finally, the ALJ stated the RFC determination was "more generous" than the conclusions expressed by a medical consultant (AR. 17).

Next, the ALJ assessed Patterson's job history and potential employability.  At step four, the ALJ determined Patterson could not perform any past relevant work (20 C.F.R. § 404.1565), particularly because she had no history of relevant work (AR. 20).  At step five, the ALJ relied upon the testimony of the VE, finding a person of Patterson's age, education, and RFC could perform a full range of light labor in various occupations that exist in the regional and national economies in significant numbers (AR. 21).  The ALJ determined that because Patterson retained the RFC for the full range of light labor, she was not disabled under the Act or entitled to SSI benefits (AR. 21).

Patterson sought review of the ALJ's decision by the Appeals Council.  In a March 10, 2010, letter informing Patterson of its denial of the request for review, the Appeals Council stated:

> In looking at your case, the Appeals Council considered the additional evidence and the contentions submitted in your representative's letters dated October 30, 2009, and November 3, 2009, listed on the enclosed Order of Appeals Council.  The new evidence that relates to the period at issue does not warrant any change in the [ALJ's] decision. . . .
>
> Also, the Appeals Council considered the fact that since the date of the [ALJ's] decision, you were found to be under a disability beginning October 22, 2009, based on the application(s) you filed on October 22, 2009; however, the Council found that this information does not warrant a change in the [ALJ's] decision.

(AR. 1-2).

Patterson appeals the Commissioner's determination on four grounds.  First, Patterson argues the Appeals Council and ALJ mishandled evaluation of Patterson's mental impairment, including failure to develop the record and consider new material evidence.  **See** Filing No. 21 - Brief p. 1.  Next, Patterson contends, on three related grounds, the record lacks substantial evidence to support the ALJ's RFC assessment; the ALJ failed to properly consider the combined effect of Patterson's joint disease and obesity; and because of these errors the ALJ posed an inaccurate hypothetical question

to the VE whose responses, accordingly, do not constitute substantial evidence. *Id.* The court will address each issue below.

## STANDARD OF REVIEW

A district court is given jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g). A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). Substantial evidence is defined as less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision. *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010); **see also** *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009) (noting "the 'substantial evidence on the record as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard"). "If substantial evidence supports the decision, then [the court] may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (alteration added). "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." *Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983). The court reviews questions of law de novo. **See** *Miles v. Barnhart*, 374 F.3d 694, 698 (8th Cir. 2004). Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole. **See** *Nettles*, 714 F.2d 835; *Renfrow v. Astrue*, 496 F.3d 918, 920 (8th Cir. 2007). Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578 (**quoting** *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (alteration added)).

**DISCUSSION**

**A.    The Commissioner's Consideration of Mental Impairment Evidence**

Patterson contends the Commissioner mishandled consideration of Patterson's mental impairment evidence.  First, Patterson argues the Appeals Council's treatment of the new evidence was cursory, rendering the ultimate decision unsupported by the evidence.  **See** Filing No. 21 - Brief p. 7.  For this reason, Patterson contends the court must review the ALJ's decision based on the evidence presented to the ALJ and the evidence presented to the Appeals Council.  *Id.*  Patterson asserts that Dr. Doyle's evaluation shows Patterson's intellectual functioning is low and Dr. Doyle's findings dovetail with Patterson's earlier diagnosis and treatment records indicating a severe mental impairment.  *Id.* at 7-8.  Second, Patterson argues the ALJ erroneously determined Patterson did not have a severe mental impairment when the medical records show her diagnosis for schizophrenia and low GAF scores.  *Id.* at 9-10.  According to Patterson, the ALJ erred by failing to obtain updated psychological evaluations because the record only contained such evaluations from 2005 and earlier.  *Id.*  Additionally, Patterson asserts her own insight into her condition is minimal as evidenced by her denial of symptoms of depression.  *Id.* at 9 (**citing** AR. 294 - Dr. Corey's prognosis deferring to prior mental health records for clarity).  The Commissioner argues the ALJ's decision is supported by the record because Patterson failed to raise her mental impairment as a basis for disability, she affirmatively denied she had any mental health issues, and she was not receiving treatment or taking medication for a mental health impairment.  **See** Filing No. 27 - Response p. 10.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe."  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  Although the requirement of severity is not an "onerous requirement," neither is it a "toothless standard."  *Id.* at 708.  An "impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby*, 500 F.3d at 708 (**citing** *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)) (noting "the impairment would have no more than a minimal effect on the claimant's ability to work"); **see** 20 C.F.R. § 404.1521(a).  When considering the severity

of mental impairments, the ALJ should consider four functional areas:  "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3).  When the degree of limitation in the first three functional areas are rated as "none" or "mild," and "none" in the fourth area, the Commissioner will generally conclude the impairment is not severe, unless the evidence otherwise indicates there is more than a minimal limitation in the ability to do basic work activities.  20 C.F.R. § 404.1520a(d)(1).

"Impairments that are controllable or amenable to treatment do not support a finding of disability." *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) (**citing *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)**).  The same is true even where the symptoms may sometimes worsen, requiring adjustments in medication, as long as the impairment is generally controllable.  *Davidson*, 578 F.3d at 846.  Likewise, the absence of evidence of ongoing counseling or psychiatric treatment or of deterioration or change in the claimant's mental capabilities disfavors a finding of disability.  **See *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000)** (concluding that a history of working with an alleged impairment, with no deterioration, was evidence that it was not severe).  Even when doctors previously concluded that a claimant's mental impairment or depression was a major factor preventing her from working, subsequent failure to treat, lack of deterioration and ongoing ability to function supports a finding the impairment is not severe.  **See *Gowell v. Apfel*, 242 F.3d 793, 797-98 (8th Cir. 2001); see also *Schultz v. Astrue*, 479 F.3d 979, 982-83 (8th Cir. 2007)** ("Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work.").  However, an ALJ should consider whether the claimant's failure to take medication or seek treatment is the result of a medically determinable symptom of the mental impairment rather than merely willful, justifiable, or unjustifiable noncompliance.  **See *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir. 2009); see also *Watkins v. Astrue*, No. 10–2590, 2011 WL 1166744, at *1 (8th Cir. Mar. 31, 2011)** (unpublished); *Wildman v. Astrue*, 596 F.3d 959, 965-66 (8th Cir. 2010) (noting depression is distinguishable from schizoaffective disorder and absent evidence showing noncompliance linked to mental limitations, noncompliance with doctor's instructions is a valid reason for discrediting subjective complaints).  Further, the ALJ has

a duty to fully and fairly develop a record; however, the ALJ does not have to discuss every piece of evidence presented. *Wildman*, 596 F.3d at 966. "Moreover, [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (alteration in original) (**quoting** *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). In the event, "the Appeals Council considers new evidence but denies review, [the court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

In this case, the Appeals Council did consider new evidence prior to denying Patterson's request for review of the ALJ's opinion. The new evidence is based on assessments of Patterson undertaken in the time period shortly after the ALJ issued an opinion about Patterson's 2006 application. However, this court will consider the evidence from Drs. Alvis and Doyle as part of the record as a whole, when determining whether the ALJ's opinion is supported by substantial evidence.

The ALJ did evaluate Patterson's mental health based on the record evidence. Additionally, the ALJ took into consideration Patterson's intelligence level by considering the record evidence, her own testimony, daily activities, and lack of treatment (AR. 16, 35, 381). The record shows Dr. Corey's opinions bolster Patterson's ability to function in a work environment, indicating Patterson's ability to adapt to change and relate to others, among other skills (AR. 294). Dr. Corey opined Patterson was not limited by depression, had fair insight, and a GAF of 61 (AR. 294). Dr. Corey also noted Patterson's prognosis was good, particularly if she complied with treatment recommendations (AR. 294). Dr. Jarrett noted Patterson did not fit the clinical definition of depression (AR. 301). Patterson's examination in January 2007 indicated no neurological involvement with her pain (AR. 362).

Based on her interview, Dr. Doyle assessed Patterson with a GAF of 50 (AR. 430). Dr. Doyle opined Patterson had extreme limitations in performing activity within a schedule and maintaining regular attendance, writing that Patterson's physical problems caused this limitation and exacerbated her mental health issues (AR. 433). Dr. Doyle's evaluation shows Patterson's intellectual functioning is low, which indicates she would have difficulty

performing jobs requiring academic skills (AR. 430).  Dr. Doyle's opinion notes Patterson suffered depression with decreased energy and thoughts of suicide (AR. 431).  However, Dr. Doyle did not indicate any other symptoms might be present such as hallucinations or difficulty concentrating or thinking, which were options on the form (AR. 431).  In stark contrast, Dr. Doyle opined Patterson had marked difficulties in maintaining concentration, persistence, or pace, resulting in a failure to complete tasks in a timely manner and would likely have uncontrolled crying spells when performing unskilled work during a normal workday (AR. 434).  These assessments also contradict other record evidence, including Patterson's own testimony.  Patterson testified she was never told she worked too slowly, does not know why she was fired from past employment, and does not allege she has any mental problems (AR. 36, 44-45, 294, 381, 430).  Similarly, Patterson repeatedly told other doctors she was not depressed or suicidal (AR. 437, 439).  The evidence in the record is consistent with Dr. Doyle's opinions that Patterson has only moderate, mild, or no limitations in areas, such as an ability to get along with co-workers, ability to accept criticism from supervisors, and ability to deal with work stress (AR. 434).

The evidence of record, as stated above, supports the ALJ's finding that Patterson had no severe mental impairment.  Although there is some evidence to support a contrary conclusion, the ALJ's conclusion is supported by substantial evidence in the record as a whole and was not made in error.  Throughout the record, treatment notes and other evidence indicate Patterson's mental impairment, if any, could be regulated by medication and her limitations were not as severe as Dr. Doyle wrote.  Dr. Doyle's opinion was internally inconsistent, contrary to Patterson's hearing testimony and other medical evidence, and relied heavily on Patterson's subjective complaints made during the interview.  A consulting physician's opinion is entitled to no special weight and may be assessed little weight when it is based largely on the claimant's subjective complaints and a contrary view is supported by better medical evidence.  See *Kirby*, 500 F.3d at 709.  Moreover, the subjective complaints contradict Patterson's hearing testimony and contemporaneous statements made to another doctor.  Many of Dr. Doyle's statements about Patterson's ability to work were unsubstantiated and unsupported.  The remaining evidence in the record about Patterson's mental impairment supports the ALJ's opinion.

The ALJ limited consideration of Patterson's RFC to unskilled labor due to record evidence about Patterson's intellectual functioning.  The evidence fails to show Patterson had more than mild limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration, and the record shows no episodes of decompensation in the relevant time period.  Under these circumstances, a finding the impairment is not severe is generally appropriate.  In this case, the evidence in the record does not otherwise indicate more than a minimal limitation in Patterson's ability to do basic work activities due to a mental impairment.  Accordingly, the court finds no error in the ALJ's finding Patterson's depression or other mental impairment was not a severe impairment under the Social Security regulations and rulings.  Finally, the ALJ did not err by failing to obtain updated psychological evaluations when the claimant explicitly denied she sought a disability finding based on a mental impairment in her application and when she had not sought mental health treatment for five to ten years prior to the alleged onset date.

## B.    The ALJ's RFC Assessment

Patterson contends the ALJ's RFC assessment is without support in the record and fails to address obvious inconsistencies in the medical evidence, in contravention of the SSRs.  **See** Filing No. 21 - Brief p. 10-13.  Specifically, Patterson argues the ALJ's determination that Patterson is capable of standing or walking 8 hours during an 8-hour workday was without support in the record.  **Id.** at 10-11.  Patterson compares the opinions of Dr. Hohensee, Dr. Jarrett, Dr. Otis, Dr. Knosp, and Dr. Doyle.  **Id.** at 11-13.  The Commissioner argues the opinions relied upon by Patterson regarding her alleged physical disability related to previous SSI applications, which were denied, and not reopened.  **See** Filing No. 27 - Response p. 18.  In addition, the record shows Patterson did engage in some employment after the date of the subject medical evidence and amended her alleged onset date to July 1, 2009, implying she was not disabled prior to that date.  **Id.**

"Social Security Rulings are agency rulings 'published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.'" **_Sullivan v. Zebley_**, 493 U.S. 521, 530 n.9 (1990) (**quoting** 20 C.F.R. § 422.408 (1989)). Social Security Rulings are not binding or conclusive on the courts, but they are entitled

to deference to the extent they are consistent with the Social Security Act and regulations. *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998); *Jones v. Barnhart*, 335 F.3d 697, 703-04 (8th Cir. 2003) ("We generally give deference to the agency's rulings on its own regulations."); **see** *Ferguson v. Comm'r of Social Sec.*, 628 F.3d 269, 272 n.1 (6th Cir. 2010).

The purpose of SSR 96-8p is "[t]o state the Social Security Administration's policies and policy interpretations regarding the assessment of residual functional capacity (RFC)." SSR 96-8p. The ruling provides:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .
> 3. When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.
> 4. The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. . . .
> 5. RFC is not the least an individual can do despite his or her limitations or restrictions, but the most. . . .

SSR 96-8p at *1.

The narrative discussion requirements of SSR 96-8p state:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities . . . and describe the

21

> maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. ***The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.***

SSR 96-8p (footnote omitted) (emphasis added).

In assessing the sufficiency of the ALJ's narrative, the court will evaluate the level of detail included by the ALJ. In this case, the ALJ explained how she determined Patterson's RFC beyond just a conclusory statement that it was "based on the medical evidence." The ALJ noted the 2005 finding that Patterson "needed sedentary work" in Dr. Hohensee's report (AR. 17 (**citing** AR. 344 as "1F/53")). However, the ALJ also noted Patterson's 2005 application for SSI had been denied by an ALJ assessing Patterson with the RFC for medium exertion work, despite Dr. Hohensee's report (AR. 17). In light of the medical evidence, including Patterson's x-rays showing moderately advanced degenerative joint disease, and with her limited flexion, normal extension, mild effusion, and no documented instability, the ALJ "has been persuaded to reduce the RFC to light" (AR. 17). Under these circumstances, the ALJ determined Patterson "should be able to sit, stand and walk for up to 6 hours during an 8-hour workday" (AR. 17).[5] The ALJ specifically noted the RFC conclusions "for maximum sustained work activity are more generous . . . than those expressed by [Dr. Knosp]" (AR. 17 (**citing** AR. 389-397 as "9F")).

In addition, Dr. Otis' January 4, 2007, opinion noted no objective findings that would restrict Patterson "from any particular form of employment" and no evidence of any neurological involvement with her pain (AR. 361-362). Dr. Otis' evaluation and opinion were made well after the opinions and observations of Drs. Hohensee and Jarrett. Although Dr. Otis' evaluation occurred prior to Patterson's car accident, Dr. Knosp evaluated Patterson in August 2007 and opined Patterson would recover the ability to engage in medium work activities and would be able to sit, stand and/or walk about 6 hours

---

[5] Although the ALJ opinion sets forth the RFC as "stand/walk for 8 hours during an 8-hour workday" in the bold section for paragraph 5, it appears "8 hours" is a typographical error, which should read "6 hours" (AR. 16). On the next page of the opinion, the ALJ notes the time period as "6 hours," which is also consistent with questions posed by the ALJ to the VE during the hearing (AR. 17, 46-47). In any event, the apparent error does not change the substance of either the ALJ's opinion or this court's analysis.

in an 8-hour workday (AR. 390, 396).  Furthermore, five days after the accident, Patterson told her health care provider that the accident did not prevent her from engaging in her normal activities, including working (AR. 381).

The ALJ also evaluated Patterson's subjective complaints noting, among other things, that Patterson's daily activities were inconsistent with her allegations of disabling symptoms and limitations (AR. 19).  Moreover, the ALJ made specific references to Patterson's reported daily activities, medical records, and inconsistencies in explaining why Patterson's complaints regarding total disability are unreliable (AR. 19-20).  These references show the ALJ did consider the record evidence from as least May 2005 (AR. 19).  The ALJ's statements about Patterson's credibility provide an explanation for the ALJ's failure to more fully discuss Patterson's mental limitations.  The court finds no error in the ALJ's application of SSR 96-8p in developing Patterson's RFC.  The narrative is sufficient in its explanation of the inconsistencies in the record with a rationale for the RFC finding.

## C.    Effect of Obesity on RFC Assessment

Patterson argues the ALJ failed to properly consider the combined effect of Patterson's severe degenerative joint disease and her obesity on her physical limitations.  **See** Filing No. 21 - Brief p. 14.  Patterson contends the ALJ only briefly mentioned the plaintiff's obesity, but neglected to consider SSR 02-1p regarding how to evaluate obesity.  *Id.*  Additionally, the ALJ did not address how the effects of the combination of obesity and joint disease on Patterson's ability to stand or walk.  *Id.*  The Commissioner asserts the ALJ appropriately considered Patterson's combination of alleged impairments.  **See** Filing No. 27 - Response p. 19-20.

It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC.  *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The ALJ may base the determination on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  Although the opinion's RFC indicates Patterson has the ability to stand or walk for 8 hours in an 8-hour workday, the opinion

repeatedly limits Patterson to light work (AR 16-17, 20-21).  Moreover, the ALJ opines Patterson "should be able to sit, stand and walk for up to 6 hours during an 8-hour workday," which is consistent with questions posed by the ALJ to the VE during the hearing (AR. 17, 46-47).  As discussed more fully above, the RFC is supported by the record evidence as a whole.  The ALJ explicitly considered Patterson's weight, which is noted throughout the record evidence (AR. 17).  Dr. Hohensee, for one, evaluated Patterson based on her degenerative joint disease, as a primary diagnosis, and obesity, as a secondary diagnosis (AR. 336).  Patterson fails to show any evidence in the record suggesting her weight warranted unusual treatment in this case beyond the consideration given by the ALJ.  The ALJ considered such evidence in light of all relevant evidence, including medical records, observations of treating physicians and others, and Patterson's description of her limitations.

### D.    Hypothetical Questions Posed to Vocational Expert

Patterson argues the ALJ committed an error by relying on the VE's answer to an improper hypothetical question.  **See** Filing No. 21 - Brief p. 15-16.  Specifically, Patterson argues the ALJ improperly failed to include Patterson's mental limitations, the extent of her physical limitations, and the effect of obesity on her physical limitations, in the question posed to the VE.  **Id.**  Patterson argues because the ALJ posed a defective hypothetical question, the hypothetical question does not provide substantial evidence to support the ALJ's conclusion of no disability.  **Id.** at 16.

"In fashioning an appropriate hypothetical question for a vocational expert, the ALJ is required to include all the claimant's impairments supported by substantial evidence in the record as a whole."  ***Swope v. Barnhart***, 436 F.3d 1023, 1025 (8th Cir. 2006).  However, hypothetical questions posed to a VE are proper if they sufficiently set out all of the impairments accepted by the ALJ as true, and if the questions likewise exclude impairments that the ALJ has reasonably discredited.  ***Pearsall v. Massanari***, 274 F.3d 1211, 1220 (8th Cir. 2001); **see** ***Gragg v. Astrue***, 615 F.3d 932, 941 (8th Cir. 2010).  An ALJ may exclude from the hypothetical question posed to the VE "any alleged impairments that [the ALJ] has properly rejected as untrue or unsubstantiated."  ***Johnson v. Apfel***, 240

F.3d 1145, 1148 (8th Cir. 2001).  "Likewise, we have held that an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that [the] impairments significantly restricted [the] ability to perform gainful employment."  *Owen v. Astrue*, 551 F.3d 792, 801-02 (8th Cir. 2008).

"In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional."  *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003); **see** *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008).  "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."  *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010).  "State agency medical . . . consultants . . . are highly qualified physicians . . . who are also experts in Social Security disability evaluation. Therefore, [ALJs] must consider findings and other opinions of State agency medical . . . consultants . . . as opinion evidence."  20 C.F.R. § 404.1527(f)(2)(i).  While "there are circumstances in which relying on a non-treating physician's opinion is proper[,]" generally, "opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole."  *Vossen*, 612 F.3d at 1016.  An ALJ does not err by considering the opinion of a State agency medical consultant along with the medical evidence as a whole.  *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007).

The ALJ's hypothetical question properly included Patterson's credible limitations. Although Patterson argues the ALJ failed to include all of Patterson's mental and physical limitations, as discussed above, the ALJ permissibly determined Patterson did not have a severe mental impairment.  **See** *Finch v. Astrue*, 547 F.3d 933, 937 (8th Cir. 2008) (finding ALJ was not required to present claimant's limited mental capacity to VE because the mental impairments did not restrict his daily activities, social functioning, or concentration).  Additionally, the ALJ relied on Patterson's work activities and daily activities in conjunction with the medical evidence.  The hypothetical posed to the VE in this case included the impairments that the ALJ found to be substantially supported by the record as a whole.  Therefore, the VE's testimony constitutes substantial evidence which

supports the ALJ's determination that Patterson was not disabled.  The ALJ did not err in considering the opinions of the state agency consultants along with the medical evidence as a whole.  The hypothetical posed to the VE in this case included the impairments that the ALJ found to be substantially supported by the record as a whole.  Therefore, the VE's testimony constitutes substantial evidence which supports the ALJ's determination that Patterson was not disabled.

## CONCLUSION

For the reasons stated above, the court concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, does not contain the errors alleged by Patterson.  Specifically, the Appeals Council and the ALJ appropriately evaluated Patterson's mental impairment evidence and substantial evidence in the record supports the ALJ's RFC finding and questions posed to the VE.  In turn, substantial evidence in the record as a whole supports the ALJ's denial of benefits.  Accordingly, the Commissioner's decision is affirmed.  Reversal or remand is not warranted.

**IT IS ORDERED:**

The Commissioner's decision is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

DATED this 18th day of May, 2011.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.